No. 21-16092

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

JAMES DAVID WILLIAMS

*Plaintiff-Appellant,*

v.

CRAIG KOENIG, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 20-cv-04348-YGR
Hon. Yvonne Gonzalez Rogers

_____

**APPELLANT'S OPENING BRIEF**

_____

Samuel Weiss
Rights Behind Bars
416 Florida Avenue, Unit 26152
Washington, DC 20001
202-455-4399
sam@rightsbehindbars.org

*Attorney for Plaintiff-Appellant James
David Williams*

**TABLE OF CONTENTS**

                                                                  **Page**

TABLE OF AUTHORITIES……………………..………………....………ii

INTRODUCTION……………………………………………………………1

JURISDICTIONAL STATEMENT…………………………………………..2

ISSUES PRESENTED…………………………………………………….....3

STATEMENT OF THE CASE………………………………………………3

SUMMARY OF THE ARGUMENT……………………………………..11

STANDARD OF REVIEW………………………………………………12

ARGUMENT…………………………………………………………...13

I.    WILLIAMS HAS ALLEGED FACTS THAT HE IS A PROPER
      PLAINTIFF TO ASSERT AN ADA CLAIM…………………………13

II.   WILLIAMS ALSO ALLEGED THE OTHER ELEMENTS OF AN
      ADA CLAIM…………………………………………………...19

      a. A safe place to sleep is a program, service, or activity under the
         ADA……………………………………………………………20

      b. Williams alleged a failure to modify in failing to provide him a
         lower bunk order…..………………………………………...22

III.  WILLIAMS SUED APPROPRIATE DEFENDANTS………....………24

CONCLUSION…………………………………………………………...26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Rosenthal*, 2 F.Supp.3d 1139 (D. Idaho 2014)........................................ 25

*Armstrong v. Schwarzenegger*, 622 F.3d 1058 (9th Cir. 2010) ............................ 21

*Becker v. Oregon*, 170 F.Supp.2d 1061 (D. Or. 2001).......................................... 25

*Byrd v. Maricopa Cnty. Bd. of Supervisors*, 845 F.3d 919 (9th Cir. 2017)............ 13

*Cohen v. Culver City*, 754 F.3d 690 (9th Cir. 2014) ............................................ 22

*Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481 (7th Cir. 1997)....................... 20, 21

*Diaz v. Perez*, 564 F. App'x 319 (9th Cir. 2014) .................................................. 13

*Duvall v. Cty. of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) ................................. 13, 20

*Eaglesmith v. Ward*, 73 F.3d 857 (9th Cir. 1996) ................................................ 24

*Feathers v. Miranda*, WL 1355704 (E.D. Cal. 2017) ......................................... 25

*Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004)........................................................... 23

*Gillespie v. Civiletti,* 629 F.2d 637 (9th Cir.1980)............................................... 25

*Hamer v. Jones*, 364 F. App'x 119 (5th Cir. 2010)............................................. 13

*Harnage v. Lightner*, 916 F.3d 138 (2d Cir. 2019) ............................................. 12

*Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929 (N.D. Cal. 2015) ............... 21

*K.M. ex. Rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013).. 20

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) .................................... 20

*Love v. Westville Corr. Ctr.*, 103 F.3d 558 (7th Cir. 1996)............................ 21, 23

*Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738 (9th Cir. 1999). .................................... 24

*Miranda B. v. Kitzhaber*, 328 F.3d 1181 (9th Cir. 2003) .................................... 24

*Munoz v. California Dep't of Corr. And Rehabilitation*, 842 Fed. App'x 59 (9th Cir. 2021) ......................................................................................................... 19

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999) ....................................... 16

*Pierce v. Cty. of Orange*, 526 F.3d 1190 (9th Cir. 2008)............................... 21, 22

*Resnick v. Hayes*, 213 F.3d 443 (9th Cir. 2000) ................................................. 12

*Rogari v. California Coastal Comm'n.*, 191 F.3d 461 (9th Cir. 1999)................. 24

*Schoenwandt v. Hawaii Paroling Authority*, 2014 WL 5822860 (D. Hawai'i 2014) ............................................................................................ 25

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).......................... 14

*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) .. 14

*Vinson v. Thomas,* 288 F.3d 1145 (9th Cir. 2002) ............................. 25

*Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680 (7th Cir. 2012) ............. 12

*Wilhelm v. Rotman*, 680 F.3d 1113 (9th Cir. 2012) ..................12, 13, 25

*Will v. Mich. Dep't of State Police,* 491 U.S. 58 (1989) ....................... 24

**Statutes**

28 U.S.C. § 1291 .................................................................. 2

28 U.S.C. § 1331 .................................................................. 2

28 U.S.C. § 1915A ................................................................ 12

29 U.S.C. § 701 ................................................................... 2

29 U.S.C. § 794(b)(1)(A) ......................................................... 20

42 U.S.C. § 12101 ................................................................ 2

42 U.S.C. § 12102(1). ........................................................ 14, 16

42 U.S.C. § 12134 ................................................................ 16

Pub. L. No. 110-325, 122 Stat. 3553 (2008)................................. 15, 16

**Other Authorities**

28 C.F.R. § 35.108 .........................................................11, 16, 17

28 C.F.R. § 35.130(b)(7)(i) ....................................................... 22

28 C.F.R. § 35.152(b)(3) ......................................................... 21

28 C.F.R. Pt. 35, App. A ......................................................... 22

Fed. R. App. P. 4(a)(1)(A) ......................................................... 2

**INTRODUCTION**

James David Williams entered the custody of the California Department of Corrections and Rehabilitation (CDCR) with a history of back problems. While incarcerated, his back issues worsened, which he documented in numerous medical requests and doctor visits. He repeatedly requested a "Lower Bunk Order," an order from the prison that allows prisoners to be housed on the lower bunk of a bunk bed when staying on the top bunk would create a risk of injury. Such an order is critically important to a prisoner who cannot safely climb to a top bunk, but it places virtually no burden on the prison. CDCR medical staff granted this accommodation to Williams several times, but allowed the accommodation to repeatedly expire despite no evidence that his back problems were temporary or improving, leaving him to again beg for a new one. For Williams, climbing up and down to the top bunk was painful and sometimes impossible.

Williams's allegations are a textbook prison ADA claim. His back troubles substantially limited him in a major life activity, which prevented him from meaningfully accessing a program, service, or activity, and CDCR was not reasonable in accommodating him. The district court nonetheless dismissed his *pro se* complaint in a pre-service screening order, which is only appropriate for the most obviously unmeritorious complaints. The court dismissed his disability claim in two sentences, one holding that he had failed to plead a disability and one that he had

sued the wrong defendants. Both are incorrect: under the appropriate standard, revised by Congress in 2008 to be extremely lenient, Williams had done more than enough to allege that he had a qualifying disability under the ADA. And suing individual CDCR officers in their official capacity is perfectly acceptable; the district court's holding that he had sued the defendants in their individual capacities was simply incorrect. This Court should reverse the district court's order and remand for service.

## JURISDICTIONAL STATEMENT

Williams brought claims under the Americans with Disabilities Act. 42 U.S.C. § 12101. The district court had jurisdiction under 28 U.S.C. § 1331. The district court dismissed Williams's claim under a screening order and entered judgment against Williams on June 7, 2021. ER-11. Williams filed a timely notice of appeal on June 23, 2021. ER-108; *see* Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.    Whether the district court erred in concluding that Williams did not have a disability under the ADA without analysis or citation to authority and despite his long record of back pain and limitations.

II.    Whether Williams plausibly alleged the other elements of a claim for disability discrimination.

III.    Whether the district court erred in holding that Williams had sued the defendants in their individual capacities when the complaint was ambiguous and courts must consider the "essential nature of the proceeding" in resolving such ambiguities, which here would require the court to consider the claims as against the defendants in their official capacities.

## STATEMENT OF THE CASE

### I.    Factual Background

James David Williams, a 39-year-old prisoner at California's Correctional Training Facility (CTF), has long suffered from severe back problems. His back problems started in 2001 when he was hit by a car. ER-73; ER-101. He was admitted to prison on January 9, 2003. Williams exacerbated his back injuries in 2006 while working a prison job that involved lifting. ER-101.

Williams reported a "severe pain" in his lower back to a primary care nurse in October 2017. ER-98; ER-101. X-rays of Williams's lower spine taken that month showed "[o]ld L1 transverse process injuries or nonunited apophyses." ER-39.[1] Williams filed a medical grievance asking for a Lower Bunk Order (LBO) in October 2017. ER-98. An LBO is an order from the prison that allows prisoners to be housed on the lower bunk of a bunk bed when staying on the top bunk would create a risk of injury. Williams explained in his grievance that the "continuous hopping up and down" required to get in and out of bed, and the "space limits" of the upper bunk that forced him to "stoop[]" while sitting there, exacerbated his back pain. ER-98. An LBO would "alleviate the pain." ER-98.

Dr. Gloria Kalisher examined Williams in November 2017. ER-78. She noted that Williams had a back spasm, and Williams was granted a temporary LBO the same day. ER-79; ER-42. The LBO expired six weeks later, in December 2017. ER-42. Williams's back pain continued, and in January 2018, he was seen by Dr. John Silva. ER-77. Dr. Silva examined Williams and noted that his "paraspinous

_____

[1] The "transverse process" is the protrusion of bone on either side of the vertebrae and can be fractured by blunt trauma (like a car collision). https://www.winchesterhospital.org/health-library/article?id=894287. A "nonunited apophyses" is an incomplete fusion of the transverse processes that sometimes appears like a fracture on an x-ray. https://radiopaedia.org/cases/non-united-apophyses-of-the-l1-transverse-processes?lang=us. Both conditions can cause back pain. https://radiopaedia.org/cases/non-united-apophyses-of-the-l1-transverse-processes?lang=us; https://www.winchesterhospital.org/health-library/article?id=894287.

musculature" (that is, the muscles supporting his spine) were "soft." ER-77. Williams was granted another temporary LBO. ER-42.

Williams's medical grievance (which the prison denied at the first level of review in December 2017) was denied at the final level of review in April 2018, exhausting Williams's remedies. ER-100; ER-103. The review board noted in its decision that Williams had been granted an LBO. ER-103–04. But the LBO that justified the board's decision expired the following week. ER-104.

Williams's back pain continued. At an April 2018 appointment with Dr. Silva, Williams said that "[p]ain level average[d] 7/10," and worsened when Williams did many routine activities—like "bending" and "sneezing." ER-75. The pain "interfere[d] with sleep," and Dr. Silva noticed that Williams's "gait [was] abnormal." ER-75.

Williams was diagnosed with spinal arthritis in June 2018. ER-42; ER-47.[2] Williams was granted another temporary LBO the day he received this diagnosis. ER-47. Christine Huxley, Williams's physical therapist, examined Williams the following month and found that he was "making good progress with PT, however,

---

[2] Spinal arthritis "is inflammation of the facet joints in the spine or sacroiliac joints between the spine and the pelvis." https://www.hopkinsmedicine.org/health/conditions-and-diseases/spinal-arthritis. "Regardless of the exact location, arthritis in the back or neck can be painful and often becomes chronic." https://www.hopkinsmedicine.org/health/conditions-and-diseases/spinal-arthritis.

continues to have decreased strength and stability of spinal and postural musculature resulting in pain with [activities of daily living]." ER-74.

Williams's LBO expired again in December 2018. ER-42. Back on the top bunk, Williams's back pain intensified. He explained to Dr. Gloria Kalisher in a January 2019 medical appointment that he felt pain when "coming down and sometimes up to" the top bunk, and when he changed his "position from supine to standing"—that is, when sitting up. ER-72. To sit up, Williams had "to turn over to [his] side," and he explained that "'[t]he way bunks are designed' makes it worse since he has to lean forward when [he] sits up in bed." ER-72. Dr. Kalisher examined Williams and found a quiver in his left leg when held straight out; decreased "R lateral flexion due to pain"; and "severe l[eft] paraspinal myospasm." ER-73; ER-42.[3] Williams was granted an LBO the same day. ER-42.

But he lost the LBO in July 2019. In July, Williams saw a new doctor—Dr. Nguyen—who was not his usual primary care provider and who was unfamiliar with his case. ER-45. Dr. Nguyen—unlike Dr. Silva, Dr. Kalisher, and Christina Huxley—did not think that Williams was really in pain. ER-45. Dr. Nguyen said he was "exaggerating," and that there was "no medical reason for [his] pain." ER-45.

---

[3] A myospasm is usually clinically indicated "via a patient history of paraspinal cramps or 'knots,' or a finding of splinting, tightness, or decreased range of motion on physical examination"—in other words, a myospasm is indicated where a patient experiences pain, discomfort, or limited mobility. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2732250/.

Williams's LBO was taken away the same day. The prison told Williams that, "[b]ased on [a] physical examination and current CDCR policy," Dr. Nguyen had "determined that you do not meet criteria for a lower bunk chrono." ER-52. To see Dr. Nguyen for that appointment, Williams had first had to wait for three hours, sitting in a "concrete/cement box area"; that night his "back flare[d] in pain." ER-45.

After losing his LBO, Williams promptly filed a request with the Reasonable Accommodations Panel (RAP). ER-35. Williams explained that his back pain interfered with his ability to do many activities: "I cannot jump up and down or turn certain angles with my upper body." ER-35. He requested a permanent LBO—or, if the prison would not grant him an LBO, then "[h]and rails or [a] ladder to access [the] Top Bunk." ER-35. He also asked for a back brace to give him support. ER-35. A few days later, Williams filed a medical grievance making similar requests. ER-45. "I've had serious and painful restrictions in my movements and daily activities that is being disregarded," he grieved. ER-45.

Williams had a follow-up appointment in August 2019 with Dr. Anderson, a primary care doctor. ER-61; ER-52. Dr. Anderson diagnosed Williams's condition as "'Chronic Back Pain,' clicked a check box on [the] computer, and stated [the] computer says 'I'm not eligible for LBO accommodation (after being eligible for past 2 years), it's out of her hands, appeal it." ER-61.

Williams did. After RAP denied Williams's request for accommodations, Williams appealed the denial, asking at the second level of review for an LBO—or if he couldn't be given an LBO, then a "handrail or ladder to access the top bunk"; or if he couldn't get a handrail or ladder, then "to be shown how to get on the top bunk without any handrail or ladder"; or, if no one could show him how to do that, then "schematics of top bunk access" so he could figure it out himself. ER-27. The second level of review denied Williams's appeal in September 2019. ER-28. Williams appealed to the final level of review, which denied his request in November, exhausting Williams's remedies. ER-31. The review board told Williams: "Your appeal takes issue with the substantive response of the RAP. The OOA is not inclined to question the findings of RAP." ER-31. Williams's medical grievance that had sought the same relief was also denied. ER-61. Williams appealed that grievance to the final level of review. ER-62. In the meantime, he submitted a request to the prison to explain "what . . . the criteria [is] for a lower bunk chrono (LBO) per Department Policy." ER-83. The prison responded: "There are a number of conditions when associated with an impairment of a major life activity [that] would confer a low bunk accommodation. Medical staff chooses the condition not the accommodation. Custody staff maintain the list of conditions which qualify for a low bunk accommodation." ER-83. This policy does not grant an LBO to a prisoner

with substantial impairment of a major life activity unless the prisoner has also received one of a limited set of diagnoses.

Williams's pain persisted while he continued to seek accommodations for his back problems. Williams was examined by a new physician, Dr. Williams, in December 2019, who evaluated him via "TeleMed," diagnosed his pain as "pseudoneurological symptoms," and referred Williams to a mental health specialist. ER-87; ER-91. Williams disagreed with the evaluation. A different doctor evaluated Williams shortly after and diagnosed him with fibromyalgia, referring him to physical therapy for treatment. ER-88.[4] Williams's physical therapist evaluated him at the end of December and "diagnosed [him] with signs and symptoms of herniated disc with a recommendation to be seen once a week for three weeks for lumbar stabilization." ER-88.[5]

Williams was granted another LBO in December 2019. ER-85. And in January 2020, the final level of review denied William's medical grievance, exhausting Williams's remedies. The denial noted Williams had a LBO. ER-49–50. Williams's LBO was taken away again in March. ER-85.

---

[4] Fibromyalgia can cause "pain, fatigue, and poor sleep quality" that "can interfere with the patient's "ability to function at home or on the job." https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780.

[5] A herniated disk "can result in pain, numbness, or weakness in an arm or leg." https://www.mayoclinic.org/diseases-conditions/herniated-disk/symptoms-causes/syc-20354095.

## II.     Procedural History

Williams, operating *pro se*, filed suit on June 30, 2020 against defendants C. Koenig, S. Posson, R. Anderson, K. Hoffman, T. Lemon, M. Sweet, R. Catrina, C. Freeman, J. Borroso, Dr. Nguyen, S. Gates, and K.J. Allen. He alleged that the defendants had violated the Americans with Disabilities Act (ADA) and demonstrated deliberate indifference to his medical needs in violation of the Eight Amendment. ER-16.

The district court issued an order of dismissal with leave to amend on January 15, 2021. On the Eighth Amendment claim, the district court held that Williams failed to "link each named Defendant to any specific acts of deliberate indifference . . . ." ER-6.[6] On Williams's ADA claims, the district court held that Williams failed to "allege facts that he is an individual with a disability such that he would be a proper plaintiff to assert an ADA claim." ER-8. The district court also held that Williams did not identify a proper defendant for his ADA claims, because "Title II of the ADA does not provide for suit against a public official acting in his individual capacity." ER-9. Williams did not amend his complaint and the district court entered a final, appealable judgment on June 7, 2021. ER-113. Williams timely appealed. ER-114.

---

[6] Williams does not appeal this aspect of the district court's order.

# SUMMARY OF THE ARGUMENT

I. The district court erred in holding that Williams failed to allege sufficient facts to establish that he is an individual with a qualifying disability under the ADA. Williams plainly met the legal test for a disability, which "is not meant to be a demanding standard." 28 C.F.R. § 35.108(i). He has severe back pain that impairs his ability to climb and jump; he constantly sought treatment for that back pain; multiple CDRC doctors and medical staff have diagnosed him with medical conditions that cause back pain, including spinal arthritis, herniated disks, and fibromyalgia; and he repeatedly pleaded for a low-bunk chrono, an accommodation that provides the sole benefit of ensuring his safe entry and exit from his bed. This evidence, especially when all reasonable inferences are drawn in his favor, meets the undemanding standard of a substantial limitation on a major life activity.

II. There is no alternative basis on which to affirm the district court's judgment because Williams alleged the other elements of an ADA claim. A safe place to sleep qualifies as a "service, program, or activity" within the ambit of the ADA according to the plain text of the ADA, this Court's precedent, and Department of Justice (DOJ) regulations. Allowing Williams's LBO to repeatedly expire, and actively revoking Williams's LBO, were plainly failures to make a reasonable modification.

III. The district court erred in dismissing Williams's claims on the basis that he had sued the defendants in their individual capacity. Williams's complaint never clarified in which capacity he was suing defendants, and given the "essential nature" of an ADA proceeding, the district court should have construed Williams's claims as against defendants in their official capacities.

## STANDARD OF REVIEW

This Court reviews de novo a district court's screening-stage dismissal of a prisoner's complaint for failure to state a claim pursuant to 28 U.S.C. § 1915A. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1118 (9th Cir. 2012). "Under § 1915A, when determining whether a complaint states a claim, a court must accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Courts "must reverse a district court's dismissal pursuant to § 1915A whenever a liberal reading of the complaint gives *any* indication that a valid claim *might* be stated." *See Harnage v. Lightner*, 916 F.3d 138, 140 (2d Cir. 2019) (emphases added).

"The purpose of § 1915A is 'to ensure that the targets of frivolous or malicious suits need not bear the expense of responding.'" *Nordstrom*, 762 F.3d at 920 n.1 (quoting *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 681 (7th Cir. 2012)). As such, the bar for surviving screening under § 1915A is low. This Court has repeatedly described § 1915A's screening requirement as a "low threshold."

*Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012); *Byrd v. Maricopa Cnty. Bd. of Supervisors*, 845 F.3d 919, 924 (9th Cir. 2017) (same); *Diaz v. Perez*, 564 F. App'x 319, 320 (9th Cir. 2014) (same). Other circuits have called it an "*extremely low threshold.*" *Hamer v. Jones*, 364 F. App'x 119, 125 (5th Cir. 2010) (emphasis added).

**ARGUMENT**

I. **Williams Has Alleged Facts That He Is a Proper Plaintiff to Assert an ADA Claim.**

"To prove that a public program or service violated Title II of the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001) (internal quotation marks omitted). The district court held that Williams did "not allege facts suggesting that he is an individual with a disability such that he would be a proper plaintiff to assert an ADA claim." ER-8. It did not conduct any analysis on this question or cite any legal authority.

As enacted in 1990, the ADA sets forth three ways to qualify as disabled: (1) having "a physical or mental impairment that substantially limits one or more major life activities of [the] individual"; (2) having a "record of such an impairment"; or

(3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Williams alleged that his injuries substantially limited several of his major life activities, including climbing, satisfying the first prong, known as having an "actual" disability.

The standard for an "actual" disability has evolved over time. Following the enactment of the ADA, the Supreme Court in two decisions denied relief to ADA plaintiffs on the basis that they were not sufficiently limited in their major life activities to qualify as actually disabled. First, in *Sutton v. United Air Lines, Inc.*, the Court held that two plaintiffs who suffered from severe myopia without corrective aids but had perfect vision with them did not qualify as disabled. 527 U.S. 471, 494 (1999). The Court based its holding in large part on its reading of "substantially limits" to "suggest[]'considerable' or 'specified to a large degree.'" *Id.* at 491.

Three years later, in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, the Court denied relief to a plaintiff with carpal tunnel syndrome who worked in an automotive plant. 534 U.S. 184, 187 (2002). The lower court had held that the plaintiff's inability to do many manual tasks, including those required by her job, qualified as a substantial limitation on a major life activity. *Id.* at 192. The Court reversed, holding that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198.

Congress quickly made clear that it disagreed with the high bar the Supreme Court had imposed on qualifying disabilities under the ADA and sought to "restore the intent and protections of" the ADA through superseding legislation. Pub. L. No. 110-325, 122 Stat. 3553 (2008). In 2008, Congress responded to *Toyota Motor* and *Sutton* by passing the ADA Amendments Act (ADAAA), which amended the ADA by broadening its definition of disability. *Id.* In the "Findings" section of the ADAAA, Congress made explicit that it was overruling the Court's decisions in *Toyota Motor* and *Sutton*:

> (4) the holdings of the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;
>
> (5) the holding of the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;
>
> (6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;
>
> (7) in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress….

*Id.* Congress further elaborated under the "Purposes" section of the Act that a primary aim was:

> (5) to convey congressional intent that the standard created by the Supreme Court in the case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an

> inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.

*Id.* The ADAAA also established a rule of construction that the definition of disability "shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102(4)(A).

The ADAAA further authorized the Attorney General to issue implementing regulations. *See* 42 U.S.C. § 12134; *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597–98 (1999) ("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II [of the ADA], its views warrant respect."). These regulations reinforced the breadth of the ADAAA's new definition of a qualifying disability: "The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108. As for the word "major" in "major life activity," it is not to be "interpreted strictly to create a demanding standard"; rather, whether "an activity is a major life activity is not determined by reference to whether it is of central importance to daily life." 28 C.F.R. § 35.108(c)(2).

The regulation's rules of construction for the term "substantially limits" further detail how broadly courts should interpret a qualifying disability. "Substantially limits" was not intended to be a "demanding standard" but instead should be interpreted "broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 28 C.F.R. § 35.108(d). The regulations made clear that the primary analysis under ADA claims should be "whether public entities have complied with their obligations and whether discrimination has occurred" rather than "the extent to which an individual's impairment substantially limits a major life activity." *Id.* An impairment constitutes a qualifying disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population," and it need not "prevent," or even "significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.* No "extensive analysis" is necessary to resolve the "threshold issue of whether an impairment substantially limits a major life activity," and the evaluation "of an individual's performance of a major life activity" compared to the general population "usually will not require scientific, medical, or statistical evidence." *Id.*

Under the lenient definition of a disability under the ADAAA, Williams plausibly alleged that he was limited in several major life activities—especially the ability to jump or climb, the only way to access his bed without the accommodations

he requested. CDCR's own medical staff took X-rays of Williams's lower spine in October 2017 that showed "[o]ld L1 transverse process injuries or nonunited apophyses." ER-39. In November 2017, a CDCR doctor noted that Williams had a back spasm and required an LBO. ER-79; ER-42. Another CDCR doctor examined him in January 2018 and noted that that his "paraspinous musculature" (that is, the muscles supporting his spine) were "soft." ER-77. At an April 2018 medical appointment, Williams reported that his "[p]ain level average[d] 7/10," and worsened when he did many routine activities like "bending" and "sneezing." ER-75. The pain "interfere[d] with sleep," and the CDCR doctor noted that Williams's "gait [was] abnormal." ER-75. In June 2018, a CDCR doctor diagnosed Williams with spinal arthritis, ER-42; ER-47, and a CDCR physical therapist examined him the following month and found that he "continue[d] to have decreased strength and stability of spinal and postural musculature resulting in pain with [activities of daily living]." ER-74. In a January 2019 medical appointment, a CDCR doctor examined Williams and found a quiver in his left leg when held straight out; decreased "R lateral flexion due to pain"; and "severe l[eft] paraspinal myospasm." ER-73; ER-42.

In addition to the allegations of doctors repeatedly finding problems with Williams's back that substantially limit him in several major life activities, including jumping or climbing to reach a top bunk, Williams frequently self-reported back

pain and an inability to safely access his top bunk without pain. ER-98; ER-101; ER-42; ER-47; ER-45; ER-35; ER-27. Furthermore, there was evidence of a several year-long and dogged pursuit of an LBO or handrail, which would have provided no benefit to him unless his limitations were genuine. ER-98; ER-101; ER-103; ER-34–35; ER-26–27; ER-61; ER-49–50.

Williams's allegations—and, indeed, evidence—easily satisfies both the standard for disability after the ADAAA and the lenient requirements for a *pro se* complainant to allege the elements of his claim. In *Munoz v. California Department of Corrections And Rehabilitation*, this Court reversed a district court opinion on virtually identical facts earlier this year. 842 Fed. App'x 59 (9th Cir. 2021). The district court had dismissed a claim by a California state prisoner with knee injuries who had been denied an LBO, holding that the prisoner did not allege a disability. *Id.* at 61. This Court reversed that decision, holding that, under a proper and expansive interpretation of the ADA, the prisoner had "provided evidence that he was substantially impaired in the major life activity as climbing." *Id.* The need for reversal here is even more pronounced as the dismissal was on screening and not on summary judgement. The district court erred in concluding that Williams did not plausibly allege a disability without reliance on authority or analysis.

## II. Williams Also Alleged the Other Elements of an ADA Claim.

Although unaddressed by the district court, Williams also successfully pleaded the other elements of an ADA claim. He alleged that he was denied meaningful access to a program, service, or activity—namely, a safe place to sleep—and he alleged that he was denied a reasonable accommodation as the ADA requires.

   a) *A safe place to sleep is a program, service, or activity under the ADA*

A claim arises under the ADA only if the plaintiff "was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). Here, the "service" from which Williams was excluded was a safe place to sleep. The Rehabilitation Act expressly defines "program or activity" to mean "*all of the operations* of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A) (emphasis added).[7] "Quite simply, the ADA's broad language brings within its scope anything a public entity does." *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) (internal quotation marks omitted).

---

[7] This Court interprets the ADA and Rehabilitation Acts in lockstep. *See K.M. ex. Rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1098 (9th Cir. 2013) ("[T]here is no significant difference in the analysis of rights and obligations created by the two Acts.").

Courts have held that this scope includes virtually all services a prison offers its inmates, from access to a dining hall to a visiting room to educational programming. *See, e.g.*, *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997) (noting that educational programing and use of a library and the dining hall are activities under the ADA); *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 558–59 (7th Cir. 1996) (holding that visitation facilities are services under the ADA). This Court has explained that "the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication" inside a prison all constitute a public entity's programs or services. *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010).

An accessible place to sleep meets the plain definition of a service provided by a public entity. *See Pierce v. Cty. of Orange*, 526 F.3d 1190, 1224 n.44 (9th Cir. 2008) ("Providing inmates with appropriate and adequate bedding and bathroom facilities are 'services' of the jail" for purposes of the ADA); *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 935–36 (N.D. Cal. 2015) ("Because of the unique nature of correctional facilities, in which jail staff control nearly all aspects of inmates' daily lives, most everything provided to inmates is a public service, program or activity, including sleeping."). The Department of Justice has also issued regulations under Title II of the ADA that require that prisons "ensure that each inmate with a disability is housed in a cell with the accessible elements necessary to

afford the inmate access to safe, appropriate housing." 28 C.F.R. § 35.152(b)(3).

DOJ explained in releasing these regulations that "[i]t is essential that corrections

systems fulfill their nondiscrimination and program access obligations by adequately

addressing the needs of prisoners with disabilities, which include, but are not limited

to . . . devices such as a bed transfer." 28 C.F.R. Pt. 35, App. A. A safe place to sleep

in a prison is a public entity's service, program, or activity, and its denial implicates

the ADA.

### b) Williams alleged a failure to modify in failing to provide him a LBO

Title II requires public entities to "make reasonable modifications in policies,

practices, or procedures when the modifications are necessary to avoid

discrimination on the basis of disability, unless the public entity can demonstrate

that making the modifications would fundamentally alter the nature of the service,

program, or activity." 28 C.F.R. § 35.130(b)(7)(i). "Title II emphasizes 'program

access,' meaning that a public entity's programs and services, viewed in their

entirety, must be equally accessible to disabled persons." *Cohen v. Culver City*, 754

F.3d 690, 694 (9th Cir. 2014).

CDCR plainly did not act reasonably in its modification, or lack thereof, of

Williams's upper bunk bed. In the prison context, "determining whether a

modification or accommodation is reasonable always requires a fact-specific,

context-specific inquiry," one that weighs the needs of disabled prisoners against the

prison's interest in security and administrability. *See Pierce*, 526 F.3d at 1217. The LBO granted to Williams, however, imposed no costs on CDCR.[8] It did not create any administrative difficulties, nor did it require any alterations in the prison's programming. It implicated no security or safety concern. *See Love*, 103 F.3d at 561. Williams' LBO was not merely withheld but at times also actively revoked. ER-44; ER-47. This action could not have provided CDCR any benefit—by necessity, half the prison population in bunk beds sleep on the bottom bunk, and there was no reason on the face of the complaint why Williams could not be among that half—but the revocation subjected Williams to gratuitous pain and risk of injury.

The process of the revocation further establishes the plausible allegation of unreasonableness. In one instance, Williams alleges that a CDCR doctor who was not his primary physician or familiar with his history took away his LBO because she believed his pain was psychological, despite the fact that an examination of his medical records would demonstrate otherwise. ER-47. She also refused to allow Williams to explain his own condition. *Id.* In other instances, Williams alleges that the prison simply let his LBO expire, reassigning him to the top bunk without giving any reasons at all. ER-44; ER-23; ER-25.

---

[8] Even under the far more demanding standard of the Eighth Amendment, courts have found that the denial of necessities to inmates when the cost of those necessities is zero is powerful evidence that the denial was unreasonable. *See Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004).

Additionally, the reasonableness of a modification is typically a question for a factfinder to resolve under the totality of the circumstances. The issue is not amenable to resolution on summary judgment, much less a frivolity screening order. *See Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738, 743 (9th Cir. 1999). There are no grounds for this Court to affirm the district court on the alternative basis that Williams did not allege a failure to modify.

## III.    Williams Sued Appropriate Defendants.

Williams sued a number of employees of the CDCR without clarifying whether he was suing them in an individual or official capacity. This Court has held that when a plaintiff fails to specify in which capacity he is suing defendants, courts "must consider the 'essential nature' of the proceeding" in determining whether the suit is of the defendant in their individual or official capacities. *See Eaglesmith v. Ward*, 73 F.3d 857, 859 (9th Cir. 1996); *see also Rogari v. California Coastal Comm'n.*, 191 F.3d 461 (9th Cir. 1999). Williams brought his claim under Title II of the ADA, which permits suits only against "public entities" and officials acting in their official capacities. *Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1187 (9th Cir. 2003); s*ee also Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Title II does not, in contrast, permit

suits against state officials in their individual capacities. *Vinson v. Thomas,* 288 F.3d 1145, 1155-56 (9th Cir. 2002).

Following this Court's guidance, district courts have treated ADA claims against individual defendants "as official capacity claims because no individual capacity claims under the statute exist." *See, e.g.*, *Feathers v. Miranda*, WL 1355704, at *3 (E.D. Cal. 2017); *Schoenwandt v. Hawaii Paroling Authority*, 2014 WL 5822860, at *4 (D. Hawai'i 2014) ("Claims against individuals under the ADA are treated as official capacity claims because no individual capacity claims exist under the statute."); *Abbott v. Rosenthal*, 2 F.Supp.3d 1139, 1144 (D. Idaho 2014) (same); *Becker v. Oregon*, 170 F.Supp.2d 1061, 1066 (D. Or. 2001). Although this Court's precedent decides the issue on its own, breaking from this Court's guidance in *Eaglesmith* would be particularly inappropriate here as courts are required to construe the pleadings of *pro se* plaintiffs especially liberally. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012); *Gillespie v. Civiletti,* 629 F.2d 637, 640 (9th Cir.1980).

The district court erred in dismissing Williams's ADA claims on the basis that he had sued the defendants in their individual capacity. Williams's complaint never clarified in which capacity he was suing defendants, and this Court's precedent required the district court to consider the nature of the ADA proceeding, which

would be permitted to proceed if, but only if, Williams's claims were against defendants in their official capacities.

## CONCLUSION

This Court should reverse the district court's dismissal of Williams's claims and remand to the district court for service and further proceedings.

Date: September 29, 2021

/s/ Samuel Weiss
Samuel Weiss

Rights Behind Bars
416 Florida Avenue, #26152
Washington, DC 20001
Attorney for Appellant James Williams

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,010 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

Date: September 29, 2021

*/s/ Samuel Weiss*
Samuel Weiss

Rights Behind Bars
416 Florida Avenue, #26152
Washington, DC 20001
Attorney for Appellant James Williams

**CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: September 29, 2021

*/s/ Samuel Weiss*
Samuel Weiss

Rights Behind Bars
416 Florida Avenue, #26152
Washington, DC 20001
Attorney for Appellant James Williams